ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

SOPHIA COOPER (CABN 320373)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6473
    FAX: (415) 436-7234
    Sophia.Cooper@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 3:23-mj-70998 MAG |
| Plaintiff, | MEMORANDUM IN SUPPORT OF UNITED STATES' MOTION FOR DETENTION |
| v. | |
| Nicol PALMA and Jordy AGUILAR, | Date: July 11, 2023<br>Time: 10:30 a.m. |
| Defendants. | Court: Courtroom 14, 18th Floor |

## INTRODUCTION

Defendants Nicol Palma and Jordy Aguilar work together. They also live together and appear to be dating. But unlike other law-abiding members of the community, Palma and Aguilar make their living and spend time together selling lethal fentanyl in San Francisco's Tenderloin neighborhood.

Over the course of a multi-week period in June 2023, Palma and Aguilar sold fentanyl multiple times to an undercover officer with the DEA. Each of these sales took place in the area of Golden Gate Avenue and Hyde Street. Palma and Aguilar were charged by complaint with federal felonies for those sales, and the evidence of their involvement in that serious criminal conduct is overwhelming.

Prior to their July 6, 2023 arrests on these federal charges, SFPD officers watched Palma and Aguilar drive in a BMW to drop off a small child at an apartment complex in Oakland and then pick up

another individual named Maxfer Palma (Nicol Palma's cousin).  Maxfer Palma has been charged in a separate federal case for narcotics trafficking, *see* N.D. Cal. No. 23-CR-00187-JSW, arising from an April 2023 state search warrant that led to the seizure of more than 200 grams of fentanyl and more than 2 kilograms of pure methamphetamine, along with a ghost gun, several rounds of ammunition, and two magazines.  SFPD officers followed the BMW from Oakland to San Francisco, watched it park, and then moved in to arrest the defendants.  Both defendants in this case, Nicol Palma and Aguilar, had several ounces of fentanyl and methamphetamine on their persons at the time of their arrest.   A subsequent search of Palma and Aguilar's shared residence in Oakland revealed over $4,000 in cash, two loaded firearms, and over 400 grams (gross) of fentanyl.

Palma and Aguilar clarified their respective conduct in their Mirandized, recorded interviews after their arrests.  They admitted to selling drugs in the Tenderloin neighborhood of San Francisco on a regular basis. Aguilar even admitted that he knew fentanyl kills people and sold drugs in the Tenderloin every day except Thursdays because that is when he believed police enforcement activities peaked.  Each defendant also admitted to handling the loaded firearms, acknowledged the fentanyl they possessed at the residence, and explained that the cash were proceeds of narcotics sales.

**Narcotics and one of two firearms recovered from defendants' residence**

 

That Palma and Aguilar are professional fentanyl dealers is further demonstrated by their arrest history.  Aguilar was arrested in November 2022 on the 700 block of Eddy Street with over 75 grams (gross) of suspected fentanyl and other drugs.  He was and is subject to a stay-away order from that block as a result of that case.  *See* Aguilar Pretrial Services Report (describing active stay-away order

through December 2025).  Palma's history is more extensive.  She was arrested in December 2021 after selling to an undercover officer on the 500 block of Turk Street in the Tenderloin and found with over 100 grams (gross) of fentanyl as well as other controlled substances.  She was arrested on the 700 block of Eddy Street in July 2022, this time working with a "holder" who possessed over 350 grams (gross) of fentanyl, over 175 grams (gross) of methamphetamine, and other drugs.  And she was arrested in September 2022 on the 700 block of Eddy Street with approximately 300 grams (gross) of various narcotics, including over 200 grams (gross) of fentanyl.  Each of those state cases has since been dismissed due to an issue with an SFPD officer witness, but they nevertheless are relevant context for Palma's conduct charged here given Palma continued to sell fentanyl, undeterred, notwithstanding multiple pending state cases for fentanyl sales.

Palma and Aguilar are also both Honduran citizens with strong incentives to flee this prosecution.  They maintain ties to Honduras and Aguilar's daughter still lives there.  And while Aguilar does not have an immigration history, Palma does and is known by immigration authorities by a different name, Alejandra Licona-Varela.  After being arrested at the border in 2016, Palma was released but failed to appear at an immigration office in 2017 as directed.  The threat of real consequences in this case gives her every reason to make a similar choice of failing to appear if released.

The defendants must overcome a rebuttable presumption that no condition or combination of conditions will reasonably ensure their appearance and the safety of the community. They cannot do so. Accordingly, the defendants should be detained pending trial.

I. **FACTUAL BACKGROUND**

   a. **The June 9 Controlled Buy**

On June 9, 2023, an undercover officer ("UC") contacted Palma by telephone and asked if she was working in the city. Palma told the UC that she was, and the UC negotiated a purchase of 3.0 grams of "clean" (a common street term for fentanyl) for $90. The UC met Palma at the corner of Hyde Street and Golden Gate Avenue, an intersection in San Francisco's Tenderloin neighborhood.  The UC followed Palma while she met with a third defendant, Joseph Bristol. Palma reached into Bristol's bags, retrieved a scale and a bag of fentanyl, and measured out three grams. The UC handed Palma $90, and asked how much an ounce of fentanyl would cost. Palma asked Aguilar, who was nearby, and Aguilar

UNITED STATES' DETENTION MEMORANDUM     3
3:23-mj-70998 MAG

said $200 per ounce. The UC told the defendants that he would purchase an ounce of fentanyl the following week prior to walking away from the area. As he was leaving, he received a text from Palma offering an ounce of fentanyl for $180.  TruNarc testing of the suspected fentanyl weighed 3.9 grams and yielded presumptive positive results.

### b. The June 12 Controlled Buy

On June 12, 2023, the UC contacted Palma at the phone number she provided to him and arranged to meet her at the corner of Golden Gate and Hyde Street.  The UC completed a sale of $500 in exchange for 3 ounces of suspected fentanyl.

### c. The June 21 Controlled Buy

On June 21, 2023, the SFPD and UC completed another controlled buy from Palma. On June 21, 2023, the UC called Palma and asked to purchase three ounces of fentanyl for $500. Palma said yes, and the UC told her he would be at Golden Gate Avenue and Hyde Street in thirty minutes. When the UC met with Palma, she again walked to an alcove where Bristol was waiting. Palma took the fentanyl from Bristol and handed it to the UC, who then gave her $500.

The UC was given three baggies of suspected fentanyl. Of those, one, weighing 28.4 grams, tested presumptive positive for fentanyl. The other two baggies weighed 28.3 grams and 28.5 grams respectively and tested as "Clear/Mannitol."  Mannitol is a common cutting agent  which is often mixed with fentanyl.  They are currently being tested further to determine if they, too, were fentanyl.

### d. June 22 Surveillance

On June 22, 2023, SFPD officers were conducting surveillance on Palma, Aguilar, and Bristol. Officers observed Palma and Aguilar manipulate, package, and weigh a white substance believed to be narcotics from two different satchels Bristol was wearing. The officers also observed Aguilar conduct hand-to-hand narcotics transactions. Bristol was subsequently detained and identified, and a search of his satchels returned 100.3 grams of fentanyl, 140.3 grams of methamphetamine, 21.5 grams of cocaine base, 28.7 grams of "clear/mannitol," and 24.2 grams of heroin.

### e. July 6 Arrest and Interviews

On July 6, 2023, SFPD officers executed warrants to arrest the defendants and search them, their vehicles, and their residence on Bancroft Avenue in Oakland CA. Officers engaged in undercover

UNITED STATES' DETENTION MEMORANDUM     4
3:23-mj-70998 MAG

surveillance of the premises, and observed the defendants, a small child, and another woman identified as C.A. entering one of the vehicles named in the search warrant. Following the defendants, SFPD officers observed them making a stop and picking up Maxfer Palma, a cousin of one of the defendants and a known narcotics trafficker. As the vehicle was driving from Oakland into San Francisco, the officers executed the arrest warrant on the defendants, and also arrested Maxfer Palma and C.A. All passengers and the vehicle were searched. Nicol Palma had two cellphones, and digital scale, and the following narcotics on her person: 96.6 grams of fentanyl, 65.2 grams of methamphetamine, and 45.0 grams of cocaine base. Aguilar had 44.8 grams of methamphetamine and 122 grams of fentanyl on his person. C.A. had a digital scale, 14.7 grams of methamphetamine and 23.4 grams of fentanyl on her person. Also in the car were three money order receipts for $100, $1,970, and $1,960. All four passengers were taken into custody, while police executed the search warrant on the residence.

The search of the Bancroft residence revealed indicia for defendants Palma and Aguilar in one of the bedrooms, as well as two loaded firearms, over 400 grams of fentanyl, and $4,394 in cash. Officers also discovered money order receipts for $100, $1,960, $500, and $1,980. The money order for $1,980 was sent by Palma, while the one for $500 was sent by Aguilar; both reflect the transfer of American dollars to Honduras. Officers also discovered Honduran passports for Palma and Aguilar.

Palma and Aguilar gave Mirandized and recorded interviews at the police station. Palma admitted to selling narcotics in the Tenderloin neighborhood on a daily basis, and that she had been selling in the area of Golden Gate and Hyde for approximately two months. She admitted to handling both of the firearms in the bedroom she shares with Aguilar, and stated that they belonged to Aguilar. She stated that the cash found in the bedroom were the proceeds of narcotics sales. She also stated that the fentanyl found in the bedroom belonged to Aguilar. The evidence in that room is concerning enough without more but Palma also stated that her 6-year-old daughter lived in the same residence that the fentanyl and guns were found.

Aguilar said that he is from Honduras and has been in the United States for around one year. He admitted to selling narcotics in the Tenderloin every day except Thursdays, because he heard there are more police officers working on Thursdays. Aguilar admitted to sending money to Honduras on a bi-weekly basis for his daughter there. He admitted that the two firearms found by officers were his, and

UNITED STATES' DETENTION MEMORANDUM    5
3:23-mj-70998 MAG

that he had handled both of them.  He also admitted that the fentanyl found in the bedroom belonged to him.

### f. Defendant' Prior Arrests and Stay Away Orders for Drug Dealing.

Palma and Aguilar have each been arrested for dealing drugs in the Tenderloin before.  Even though the cases have not resulted in convictions and Palma's cases were recently dismissed in late June and early July based on an SFPD officer's unavailability to act as a testifying witness, this pattern of behavior while the cases *were* pending demonstrates their apparent unwillingness and inability to stop dealing lethal drugs in the Tenderloin while out of custody.

December 2021: Palma was arrested in December 2021 after selling to an undercover officer on the 500 block of Turk Street in the Tenderloin.  In a search incident to her arrest, officers recovered over 100 grams (gross) of fentanyl as well as other controlled substances.  This case was dismissed in July 2023.

July 2022: Palma was arrested on the 700 block of Eddy Street in July 2022, working with a "holder" who possessed over 350 grams (gross) of fentanyl, over 175 grams (gross) of methamphetamine, and other drugs.  This case was dismissed in June 2023.

September 2022:  Palma had a warrant for her arrest based on the July 2022 incident described above.  She was arrested on the 700 block of Eddy Street with approximately 300 grams (gross) of various narcotics, including over 200 grams (gross) of fentanyl.  This case was dismissed in June 2023.

November 2022: Aguilar was arrested in November 2022 on the 700 block of Eddy Street after SFPD officers watched him engaged in a hand-to-hand drug deal on the street.  with over 75 grams (gross) of suspected fentanyl and other drugs.  He is subject to a stay-away order from that block as a result of that case.  *See* Aguilar Pretrial Services Report (describing active stay-away order through December 2025).

## II. LEGAL STANDARD

Under the Bail Reform Act of 1984, the Court must detain a defendant before trial without bail where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). Detention is appropriate where a defendant is either a danger to the community or a flight risk; the government need

not prove that both factors are present. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). A finding that a defendant is a danger to the community must be supported by clear and convincing evidence, but a finding that a defendant is a flight risk need only be supported by a preponderance of the evidence. *Id.*

"[T]he Bail Reform Act mandates an individualized evaluation guided by the factors articulated in [18 U.S.C.] § 3142(g)." *United States v. Diaz-Hernandez*, 943 F.3d 1196, 1199 (9th Cir. 2019). Those factors are: (i) the nature and circumstances of the offense charged; (ii) the weight of the evidence against the defendant; (iii) the history and characteristics of the defendant, including the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings, as well as whether the crime was committed while the defendant was on probation or parole; and (iv) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).

Where there is probable cause that a defendant has violated the Controlled Substances Act and faces a maximum of 10 years in prison or more (as here), courts apply a rebuttable presumption that no condition or combination of conditions will reasonably assure the defendant's appearance as required and the safety of the community. *See* 18 U.S.C. § 3142(e)(3)(A). Under this scheme, the burden of production shifts to the defendant. *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008). Although the presumption is rebuttable, it is not a "bursting bubble." *United States v. Jessup*, 757 F.2d 378, 382-83 (1st Cir. 1985) (Breyer, J.), *abrogated on other grounds by United States v. O'Brien*, 895 F.2d 810 (1st Cir. 1990). In other words, the presumption is not so weak that if a defendant introduces evidence, "the presumption 'bursts' and totally disappears, allowing the judge (or jury) to decide the question without reference to the presumption." *Id.* (further stating that such an approach would "render the presumption virtually meaningless" because a defendant can "always provide the magistrate with *some* reason" (emphasis added)). Even if the defendant rebuts the presumption, the presumption is not erased; instead, it remains in the case as an evidentiary finding militating against release that is to be weighted along with other relevant factors. *See U.S. v. King*, 849 F.2d 485 (11th Cir. 1988); *accord United States v. Ward*, 63 F. Supp. 2d 1203, 1209 (C.D. Cal. 1999) (citing *Jessup*, 757 F.2d at 389).

UNITED STATES' DETENTION MEMORANDUM      7
3:23-mj-70998 MAG

### III. ARGUMENT

#### a. The Defendants Face a Rebuttable Presumption in Favor of Detention

The defendants are charged with violating 21 U.S.C. § 841(a)(1) and (b)(1)(C). The charge carries a statutory maximum penalty of more than ten years' imprisonment. 21 U.S.C. § 841(b)(1)(C). As such, there is a rebuttable presumption that no condition or combination of conditions will reasonably ensure the defendants' appearance as required and the safety of the community. *See* 18 U.S.C. § 3142(e)(3)(A). As described below, the defendants cannot overcome this presumption.

#### b. The Defendants Cannot Overcome the Presumption That They Are Flight Risks

A preponderance of the evidence establishes that the defendants present a flight risk absent pretrial detention. Especially given the strength of the evidence—recorded undercover buys—the government can prove beyond a reasonable doubt the charged offense. In light of the strong likelihood of conviction, defendants have a strong incentive to flee. *See United States v. Gebro*, 948 F.2d 1118, 1122 (9th Cir. 1991) (strong evidence of guilt "makes it more likely that he will flee"). In addition, defendants' Mirandized admissions and the significant quantity of fentanyl and two firearms seized at their residence means that they face significant criminal liability with additional charges and higher sentencing exposure. Those possible consequence decidedly tip the calculus of whether they should stay and face the consequences in a community to which their ties are built on drug dealing, or pivot to a new city to ply their drug trade, or simply return back to Honduras to enjoy a life built on the profits earned from selling fentanyl in San Francisco.

This is not mere hypothetical conjecture. They are Honduran nationals with active Honduran passports and numerous recent money transfers sent to Honduras. Aguilar's daughter lives in Honduras and presumably provides him with community ties there. And Palma is known by a different name by immigration authorities and demonstrated an unwillingness to comply with lawful immigration orders when she failed to appear at an interview in 2017 following her arrest at the border.

#### c. The Defendants Cannot Overcome the Presumption That They Are a Danger to the Community

Pretrial detention is also appropriate because clear and convincing evidence demonstrates that the defendants pose a danger to the community. The defendants admitted to law enforcement that they

sell dangerous drugs, including fentanyl, on a regular basis.  *See, e.g.*, *United States v. Alfonso Ramos*, No. 3:20-mj-71799-MAG-1 (EJD), 2020 U.S. Dist. LEXIS 244831, at *7 (N.D. Cal. Dec. 29, 2020) (sale of approximately 227 grams of fentanyl showed defendant posed a danger to the community because "[f]entanyl is among the most dangerous and deadly illegal drugs").  The distribution of fentanyl continues to have deadly results and is currently driving a surge in overdose deaths in San Francisco that is outpacing the hundreds of such annual deaths that have been tracked in recent years.[1] Aguilar even acknowledged that fentanyl kills people after describing his strategy of selling in the Tenderloin every weekday except Thursday to avoid police detection.  And their response to state arrests and stay away orders?  It was not to stop their criminal conduct but instead to move to another block to continue selling poisonous fentanyl to the most vulnerable members of the community in the Tenderloin.  If released, it is foreseeable that the defendants will continue to support themselves the way they have been—by selling fentanyl and other drugs.  The danger is even more pronounced given the defendants' possession of—and therefore access to—multiple firearms.  Additionally, maintaining a home base where defendants possessed fentanyl for sale and firearms in close proximity to where a six-year old child lives creates an additional danger to the community, and in particular, to a vulnerable child; the risks of small children dying because of inadvertent exposure to fentanyl is a tragic but unfortunately common event in the Bay Area given the prevalence of fentanyl.

### IV.   CONCLUSION

For the reasons stated above, the Court should detain the defendants pending trial based on the serious risk of flight and the serious danger to the community.

DATED: July 11, 2023                             Respectfully submitted,

ISMAIL J. RAMSEY
United States Attorney

/s/ Patrick O'Brien
SOPHIA COOPER
PATRICK K. O'BRIEN
Assistant United States Attorneys

---

[1] Yoohyun Jung, *74 People Died in May in San Francisco from Accidental Overdoses*, S.F. Chron., June 15, 2023 (https://www.sfchronicle.com/projects/2021/san-francisco-drug-overdoses-map/). San Francisco is on pace to have 830 accidental overdose deaths in 2023. *Id.*